## SAMUELS SHOE CO. v. FRENSLEY.

No. 20147. Opinion Filed Sept. 22, 1931.

Pierce, McClelland & Kneeland, and Brown & Williams, for plaintiff in error.

Johnson, McGill & Johnson, for defendant in error.

CULLISON, J. This action was commenced in the district court of Carter county, Okla., on the 14th day of January, 1928, by the plaintiff, Samuels Shoe Company, a corporation, to recover of and from the defendant, Louise Frensley, the sum of $550 alleged to be due said plaintiff by the defendant by reason of her indorsement of one certain note for Jack Scanlon.

The plaintiff, for its cause of action, alleges and states:

"Petition.

"Comes now the plaintiff and for cause of action against the defendant alleges and states:

"First, that plaintiff is a corporation organized under the laws of the state of Missouri, with its principal place of business in St. Louis, in said state.

"Second, that heretofore, to wit: On April 2, 1927, for good and valuable consideration, Jack Scanlon did make, execute, and deliver to this plaintiff his certain promissory note in writing of that date wherein and whereby he agreed to pay to the order of this plaintiff on October 10, 1927, the sum of five hundred fifty dollars ($550) without interest; that said note provided that if the same be placed in the hands of an attorney for collection that the maker thereof would pay an attorney's fee of 10 per cent. of the amount due; that at the same time and same place, for valuable consideration, the defendant herein, Louise Frensley, did endorse said note on the back thereof; that the said note after the execution and indorsement thereof was thereupon delivered to this plaintiff; that this plaintiff is the owner and holder of said note; that a full, true, and correct copy of said note, together with the endorsement thereon of the defendant herein, is hereto attached, marked exhibit 'A' and made a part hereof.

"Third, that by reason of the foregoing, the defendant herein became liable and bound to pay to this plaintiff said sum of five hundred fifty dollars ($550) on October 10, 1927; that the said defendant has wholly failed, neglected, and refused to pay the same or any part thereof, and by reason of the foregoing, it has been necessary for the plaintiff to place said note in the hands of attorneys for collection and to bring this suit thereon; that by reason of the foregoing, plaintiff is entitled to judgment against said defendant for the sum of five hundred fifty dollars ($550) with interest thereon at 6 per cent. per annum from October 10, 1927, fifty-five dollars ($55) additional as attorneys' fees and costs.

"Wherefore, plaintiff, Samuels Shoe Company, a corporation, prays that it have judgment against the defendant herein, Louise Frensley, for the sum of five hundred fifty dollars, ($550) with interest at the rate of 6 per cent. per annum from October 10, 1927, for fifty-five dollars ($55) attorneys' fees, and all costs of this action."

The note sued on was attached to plaintiff's petition. Defendant, for her answer to plaintiff's petition, alleges and states:

"Answer.

"Comes now the defendant, Louise Frensley, and, for answer to the petition of the plaintiff filed herein, alleges and states:

"1st. This defendant admits that she endorsed the note sued on herein, but alleges that said note is null and void for the reason that it was executed in pursuance of a contract and agreement which was against public policy and void under the following circumstances, to wit:

"That prior to the time the note sued on herein was executed, one Jack Scanlon, who is the only son of this defendant, was engaged in business in Shawnee, Okla., and this defendant resided in Duncan, Okla. That on or about the 2nd day of April, 1927, the date this defendant endorsed said note, one ____ Tieman, whose given name and initials are unknown to this defendant, came to defendant's home in Duncan, Okla., and acting for and on behalf of the plaintiff herein, represented to this defendant that the said Jack Scanlon had committed an offense against the laws of the state of Oklahoma in that he had obtained goods from said plaintiff under false pretense by making a false statement of his financial standing, and that said offense constituted a felony against the laws of the state of Oklahoma, and that said plaintiff was preparing to prosecute the said Jack Scanlon. Defendant says that at said time and place plaintiff, through its agent, the said Tieman, agreed that if this defendant would endorse the note herein sued on, the plaintiff would cover up and quash said prosecution and excuse the said Jack Scanlon from his crime, and that in pursuance of said agreement this defendant indorsed said note, and that said agreement was the sole and only consideration for the same on the part of this defendant, and that said agreement was contrary to public policy, and that by virtue of said fact said note is wholly void and without consideration.

"2nd. For further answer to the petition of the plaintiff filed herein, this defendant says that, on or about the 2nd day of April, 1927, the plaintiff, acting through its agent, ____ Tieman, was alleging that one Jack Scanlon, the son of this defendant, had committed an offense against the laws of the state of Oklahoma, and that he had obtained goods under false pretense from the plaintiff, and that said plaintiff was preparing to prosecute him for said offense. That the said Tieman, acting for and in behalf of said plaintiff, obtained the indorsement of this defendant to the note sued on herein, representing to said defendant that unless she indorsed said note that the said Jack Scanlon would be prosecuted for his alleged offense against the laws of the state of Oklahoma. That the said defendant, induced by the wrongful use of fear and threats of prosecution of the said Jack Scanlon, indorsed and delivered said note to Tieman, the agent of the plaintiff, and that said note was without consideration and obtained through fear, duress, and un-

due influence, and that said threats were the sole and only consideration on the part of this defendant for the execution of the same.

"Wherefore defendant prays that the plaintiff take nothing by reason of its petition, and that said note be canceled and that said defendant be allowed to go hence with her costs and such other and further relief as may be equitable and just."

Defendant's answer is verified. In reply to defendant's answer, plaintiff files its reply, denying specifically "that the indorsement of the defendant upon the note herein sued upon was obtained through fear, duress, undue influence, or without consideration."

Parties will be referred to as they appeared in the court below.

Plaintiff in error, plaintiff below, assigns 12 errors, all of which may be consolidated and discussed under two heads:

First: The court erred in overruling plaintiff's motion for a new trial.

Second: The court erred in giving certain instructions to the jury and erred in failing to give certain instructions to the jury offered by plaintiff.

Plaintiff contends that the court refused to give many instructions offered by plaintiff. The court finds, after a careful examination of the instructions refused by the court, that all the propositions raised by plaintiff in the instructions offered by it were fairly covered by the instructions given by the court.

After careful examination of the record and rulings of the court, we are of the opinion that the motion for a new trial should have been overruled. We have also very carefully reviewed the instructions given by the court and the instructions offered by plaintiff and refused by the court. We think the instructions given by the court, taken as a whole, fairly state the law of the case.

In the case of Holmes v. Halstid, 76 Okla. 31, 183 P. 969, the court in the fourth paragraph of the syllabus said:

"It is not error for the court to refuse a requested charge, when the same proposition is covered by the instructions given, and which, taken as a whole, fairly submit to the jury the law applicable to the case."

Defendant, in the second paragraph of her answer, says:

"2. For further answer to the petition of the plaintiff filed herein, this defendant says that, on or about the 2nd day of April, 1927, the plaintiff, acting through its agent, ____ Tieman, was alleging that one Jack Scanlon, the son of this defendant, had committed an offense against the laws of the state of Oklahoma, and that he had obtained goods under false pretense from the plaintiff, and that said plaintiff was preparing to prosecute him for said offense. That the said Tieman, acting for and on behalf of said plaintiff, obtained the indorsement of this defendant to the note sued on herein, representing to said defendant that unless she indorsed said note that the said Jack Scanlon would be prosecuted for his alleged offense against the laws of the state of Oklahoma. That the said defendant, induced by the wrongful use of fear and threats of prosecution of the said Jack Scanlon, indorsed and delivered said note to Tieman, the agent of the plaintiff, and that said note was without consideration and obtained through fear, duress, and undue influence, and that said threats were the sole and only consideration on the part of this defendant for the execution of the same."

The sole and only question in the instant case for our determination is:

"Did the defendant, Louise Frensley, indorse the note sued on, solely for the purpose of avoiding any criminal prosecution of her son, Jack Scanlon?"

Whether or no the defendant was induced by duress, threats, or other unlawful means to indorse the note sued on can be determined only by the evidence adduced and the law of the case.

The testimony, in part, is as follows:

The defendant, Louise Frensley, in her direct examination, testifies:

"Q. Do you remember indorsing this note to the Samuels Shoe Company? A. Yes, sir. Q. At that time where were you living? A. I lived in Duncan then. Q. You live now in Ardmore? A. Yes, sir. Q. Mrs. Frensley, did you ever owe the Samuels Shoe Company anything? A. No, sir, I did not (R. 18). Q. Will you please detail to the jury and court how you come to indorse it, and why? A. Mr. Tieman ____. Q. This gentleman here? A. Yes, sir. * * * Q. Was anyone with you? A. No, sir. he was there at my home when I got there, and he talked about the indebtedness, and told me it had to be fixed up, it would mean ruination for him to go broke, and I said I did not see any reason to put myself out in the street then, and did not feel I should do anything more, and he said, 'You would if you knew your boy would be prosecuted, wouldn't you,' and I said, 'What, do you mean,' and he said, 'I have in my brief case a false statement he made,' and I said, 'What is that,' and he said, 'He did not show he owed you anything, in his financial statement,' and I said I figured the child maybe did not figure he owed me anything. * * * Q. What did he say in any of the conversation about sending Jack to the penitentiary, or any such

threats, if he made any? A. That was the reason and the grounds I signed it. Q. What did he say? A. He said he would prosecute Jack (R. 19). Q. How long did he talk with you before you signed the note? A. Some hours. Q. Did he at any time state what they had done with others making a similar statement to the one he claimed Jack had made? A. Yes, sir. Q. State what that was? A. I don't remember in full; he related where they had prosecuted people, and sent them to the penitentiary, and he told me of one instance of a misstatement of about $300 I thought was rather severe, said they sent a man up for not including $300 he owed, failed to include that item in his financial statement (R. 20). Q. Did he say anything to you about what the effect would be if they prosecuted Jack for making this false statement? A. Just said he would prosecute him, and I was uneasy about it. Q. As to the effect of it on Jack? A. Said it would ruin him, it would ruin him to go broke or be prosecuted. Q. And you talked over that matter two or three hours before you signed the notes? A. Yes, sir. Q. From his conversation there, what did you understand would be the result if you failed to sign the note? A. That Jack would be prosecuted. Q. Would you have signed this note, or these notes, if you had thought or understood from the talk Mr. Tieman had with you that your son would not be prosecuted? A. No, sir. I would not. Q. That was the sole consideration of your signing these notes? A. Yes (R. 21). Q. This was a debt owed by your son? A. Yes, sir. Q. You were not a member of the firm and had no interest in the business? A. None whatever (R. 22)."

Jack Scanlon, being called as a witness, testifies as follows (R. 34):

"Q. Jack, are you acquainted with Mr. Tieman? A. Yes, sir. Q. Did you owe the plaintiff for a bill of shoes? A. Yes, sir. Q. State whether or not Mr. Tieman came to see you and why he came to see you about the bill you then owed? A. I had written them. Q. Who? A. Samuels Shoe Company, Mr. Tieman was the credit man (R. 34). Q. You talked to him? A. Yes, sir and he said, 'Jack,' he says, 'I got your letter at the house, and the house sent me down here and, they want to know what you are going to do,' and I said, 'I am at the row's end,' and he says, 'You know you are liable to prosecution for making a false statement,' and I said, 'What do you mean?' and he told me where I had not listed this money my mother paid off to a bank in Texas, and he said he would like to see my mother and he said. 'How far is it down there to where she is?' and I told him, and he said, 'Can't we drive through, or shall we go on the train?' Q. Go ahead. A. On the way over there Mr. Tieman told me of case where he represented the shoe company where the people got in bad, and their outcome, and that sort of thing, and in one case he said

he had to wait five years to send two boys, at Burkburnett, to catch the boys, such things and similar things. Q. By the Court: What was the result? A. To send them to the penitentiary, and another case where a man owed his relation $200 that had not been listed, and also sent him to the penitentiary * * * (R. 35). Q. Go ahead and detail what next transpired? A. I was in Duncan, and I was surprised to see he was not interested in the store over there at all, and only wanted to see my mother, and wanted to see our banker at Duncan, and I took him down and introduced him to the man there, and they asked me to leave the room, and what they said I don't know (R. 36). Q. Say anything, want her to sign some notes? A. Yes, sir. He asked her to sign them, and she went on to say how much she had done for me, and was not able to do any more, and presently he just raised forward and said, 'You would if it was a matter of prosecution, wouldn't you?' and said, she said—I forget just what she said—They argued it quite a while and later on she finally signed the papers. Q. Did he recite to her any instances where they had sent any one to the penitentiary? . A. That was the general theme of the conversation. Q. Before she signed the notes? A. Yes, sir (R. 37)."

Cross-examination of Jack Scanlon:

Q. "Did you hear Mr. Tieman make these threats that your mother referred to? A. Yes, sir, he had it on his mind all the time. Q. You were there and your mother was there? A. Yes, sir (R. 41). Q. And you know she signed these notes, this note, by reason of these threats? A. Yes, to protect me. Q. To protect you? A. Yes, sir. Q. What did you tell Mr. Tieman when he was making these threats? A. I looked at him and said, 'I have given you everything, I have got my hands tied, and you want to send me to the penitentiary, I have done all I can do.' Q. What did he say then? A. He said, 'I will try to get your mother to protect you,' is just what he said (R. 42). Q. And yet you want this jury to believe these notes were signed by reason of the fact that he was threatening to send you to the penitentiary, that is right? (R. 44). A. By so doing I was protecting myself, and I would not have to go to the pen (R. 45)."

C. D. Tieman, being called as a witness for plaintiff, testifies as follows:

"Q. Did you have an occasion to see Jack Scanlon and the defendant, Mrs. Frensley, in March or April, 1927. A. Yes, sir (R.47). Q. Had you said anything to Mr. Scanlon about any false financial statement up to that time, had any conversation about it? A. In our drive from Shawnee, Okla., to Duncan, Mr. Scanlon mentioned an indebtedness of $6,000 that he owed a bank in Nocona, Tex., indorsed by his mother, and it stuck me and shocked me, and I said, 'I don't know anything about any such an indebted-

ness,' and he said, 'I borrowed it not long ago and my mother indorsed it, and I did not put it in my financial statement,' and I said, 'Jack, you have had no business experience much, and you put yourself in a bad position in the hands of others, it is a risky thing to do that. There are instances where people engaged in the mercantile business have turned such things over to the wrong parties where it was done through carelessness or with evil intent and people sent to jail, and I recited one or two such instances.' Q. By the Court: What is wrong with that in the business world? A. It places the wholesaler in a poor position to continue the credit business. Q. By the Court: How did he get in jail on that, I know but tell the jury? A. If the statement is proven to be false and is sent through the mails and merchandise obtained on this statement the post-office department considers that as using the mails to defraud, and if not sent through the mails the man who has been defrauded can make the complaint and recover sometimes by the contention that the merchandise was obtained through fraud. Does that answer the question (R. 49)? Q. By the Court: You explained that to Jack on the road to Duncan? A. Yes, I advised him about it, I said it was foolishness, you tied yourself up. Q. By the Court: Did you tell him the term they got? A. I know the time, I did not tell him, two got 18 and one eight months. Q. Prior to the time he told you about that, did you know anything about this $6,000 item? A. Not anything until he told me he borrowed this $6,000 (R. 50). Q. When you were talking to Mrs. Frensley, did you say anything about Jack, prosecuting Jack, if she did not sign the note? A. I did not at any time (R. 52)."

Cross-examination:

"Q. Mr. Tieman, what was your business while employed by this firm? A. Handling the credit and approving orders. Q. You have not been back in the credit business since you quit them? A. No, sir (R. 53). Q. And told him how it was that people got in the penitentiary for doing that? A. Yes, sir. Q. And you got to talking to Mrs. Frensley and told her of this false statement? A. I did not call it a false statement. Q. You told her about it? A. It was brought up. Q. Did you bring it up? A. Not directly to Mrs. Frensley, I did not. (R. 54). Q. You talked to Jack in her presence about making this false statement? A. Yes, during the conversation it was brought up. Q. And you said you know this has to be fixed up because you have made a false financial statement? A. I did not say that. Q. What did you say? A. I said Jack had done something very foolish. Q. And you told there what the result could be, in her presence? A. Yes, I suppose I did. I do recall that— (interrupted). Q. You heard her testimony this morning? A. Yes, sir. Q. You sit right there and heard her testimony about having sent some young man to the penitentiary for making a false statement. How do you suppose she knew that if you did not say it? A. I do not recall the words, or what I said along those lines. I do say it was talked about the nature of it, in the same way I discussed it with Jack, that it was foolish to do it, and showed inexperience and ignorance (R. 55). Q. And used as an illustration some of those young men that had been sent to the penitentiary? A. In the most friendly spirit. Q. You told them about it? A. Yes, sir. Q. And you were four hours making her believe that? A. Yes, sir, or more. Q. Five hours? A. Yes, sir. Q. Refusing to sign it all the time? (R. 56). A. I did not understand at first just what could be done. We were busy figuring it,—I did not ask her to indorse the notes until about three hours or more after I arrived at the place. I did tell her if I got the time extended, I would have to have the indorsement (R. 57). Q. In the meantime you told her, or in her presence, about these young men being sent to the penitentiary for making false financial statements, didn't you? A. I had told her in the general conversation, and told her in a very friendly spirit (R. 57)."

Having carefully reviewed the entire evidence adduced, we are clearly of the opinion that plaintiff obtained defendant's signature to the note sued upon by duress, threats, and other unlawful means, and that said threats made by plaintiff, or its duly authorized agent, C. D. Tieman, operated on the mind of this defendant to such an extent as to deprive her of her free will; that defendant would not have indorsed said note had she not been convinced that the son would have criminal charges filed against him, and possibly imprisoned.

Bouvier defined "duress" as "an actual or threatened violence or restraint of a man's person contrary to law to compel him to enter into a contract or to discharge one. It implies a restraint which overcomes the will, and, to constitute it, threats must be used."

"The true doctrine of duress, at the present day, both in this country and in England, is that a contract obtained by so oppressing a person by threats regarding his personal safety or liberty, or that of his property, or of a member of his family, as to deprive him of the free exercise of his will and prevent the meeting of minds necessary to a valid contract, may be avoided on the grounds of duress. * * *" Callendar Sav. Bank v. Loos (Iowa), 120 N. W. 317.

"The law no longer allows a person to enjoy without disturbance the fruits of his iniquity, because his victim was not a person of ordinary courage, and no longer gauges the acts that shall be held legally sufficient to produce duress by any arbitrary standard, but holds him who, by putting another in fear, shall have produced in him

a state of mental incompetency to contract, and then takes advantage of such condition, no matter by what means such fear be caused, liable at the option of such other to make restitution to him of everything of value thereby taken from him." Callendar Sav. Bank v. Loos (Iowa) 120 N. W. 317, and many other citations.

"Under the modern rule of law, actual or threatened use or misuse of criminal process, legal or illegal, sufficient to overpower and overcome the will of the party threatened, constitutes duress." Wilbur v. Blanchard (Idaho) 126 Pac. 1069.

"The obtaining of a note through the payee's threat to prosecute the maker for a criminal offense not relating to or injuring the payee, though the maker be guilty, constitutes 'duress'." Thompson v. Hicks (Tex. Civ. App.) 100 S. W. 357.

"To deprive one of his will and understanding by reason of threats or other unlawful means, so that a note thus obtained is not his free and voluntary act, constitutes duress." Morrow v. Barnes, 81 Neb. 688, 116 N. W. 657.

"Duress exists when one, by an unlawful act of another, is induced to make a contract or perform some act under circumstances which deprive him of the existence of his free will." Knight v. Brown (Mich.) 100 N. W. 602, and other authorities from many states.

"Under the modern theory, 'duress' is to be tested, not by the nature of the acts or threats, but rather by the state of mind of the victim induced by such acts and threats." Williamson-Halsell-Frazier Co. v. Ackerman (Kan.) 94 Pac. 807.

Where a father is coerced into executing a mortgage to secure the payment of a defalcation of his son by threats of the arrest and prosecution of the son for embezzlement if such security is not given, the mortgage may be avoided on the ground of duress. (See the case just cited.)

If the threats of the arrest and prosecution of the son operated to deprive the father of his free will power and to constrain the execution of the mortgage, the actual guilt or innocence of the son was not a material question in determining whether there was duress. (See case just cited.)

The jury found for the defendant, Louise Frensley, in the instant case, and judgment was rendered by the court in accordance with the verdict of the jury.

The judgment of the trial court is affirmed.

LESTER, C. J., CLARK, V. C. J., and RILEY, HEFNER, and KORNEGAY, JJ., concur. McNEILL, J., concurs in conclusion. SWINDALL, J., dissents. ANDREWS, J., absent.

SWINDALL, J. (dissenting). I cannot agree to the rule of law announced by the majority opinion in this case. Plaintiff's action is founded upon contract. "Duress," as applied to contracts in this state, is defined by statute as follows (Comp. Stat. 1921, sec. 4993):

"4993. Duress defined. 'Duress' consists in: First. Unlawful confinement of the person of the party, or of husband or wife of such party, or of an ancestor, descendant, or adopted child of such party, husband or wife.

"Second. Unlawful detention of the property of any such person; or,

"Third. Confinement of such person, lawful in form, but fraudulently obtained, or fraudulently made unjustly, harrassing or oppressive."

The definition of duress under our statutes would not in any way apply to the facts in this case, since there was no imprisonment of the son of defendant, and no other facts are pleaded or proof offered to bring the case within the terms of the statute, and I do not feel that this court is at liberty to ignore the statute and define duress, as applied to contracts, as the court has done in this appeal.

I therefore most respectfully dissent.

Note—See under (1), (2) 9 R. C. L. 711; R. C. L. Perm. Supp. p. 2536. (4) 9 R. C. L, 716. R. C. L. Perm. Supp. p. 2537.