CENTRIC CORPORATION, Appellant,

v.

MORRISON–KNUDSEN
COMPANY, Appellee.

No. 66376.

Supreme Court of Oklahoma.

Dec. 16, 1986.

**412**

Patricia A. Howard, Thomas N. Frisby, Michael E. Krasnow, Oklahoma City, for appellant.

James A. Jennings, III, Ronald R. Hudson, Oklahoma City, for appellee.

KAUGER, Justice.

The origins of this case reach back to May, 1977, when Morrison-Knudsen, a Colorado construction company, appellee, the construction manager for the General Motor assembly plant in Oklahoma City, Oklahoma, solicited bids from Centric Corporation, appellant, to subcontract concrete work at the proposed site. The specifications for the $12.5 million dollar contract included laying a slab of reinforced concrete eight inches thick and building a number of concrete pits in a three million square foot floor in the main assembly plant owned by the Oklahoma Industrial Authority.

On June 1, 1977, Centric signed a contract with Morrison-Knudsen and subsequently began work on the slab-on-grade and basement areas. According to Centric, trouble began immediately after it moved equipment and personnel onto the job site. Centric asserted that Morrison-Knudsen, because of its status as construction manager, was responsible for scheduling and coordinating the work among the various contractors and for supervising the entire project in accordance with the milestone schedule included in the contract and the bid package. Centric alleged that Morrison-Knudsen, in violation of the inherent contractual duties and covenants contained in the milestone schedule, failed to provide access roads and drainage in the work areas. Centric also alleged that: because the work sites were not designated in proper contractual sequence, other contractors were still working in Centric's construction area causing substantial delays in Centric's work performance; numerous changes were made in the final design after the contract was signed and shop drawing submittals were not approved on a timely basis; subgrade problems at Centric's job location had to be corrected; and although changes and extra work were ordered beyond the contemplation of the contract causing the work to be more difficult, cost-

---

1. The Tenth Circuit actually certified five questions, but because some of them were redundant and premature, we have consolidated its query. The questions certified were:

   1. Whether a party may state a cause of action under Oklahoma law for economic duress?
   2. If Oklahoma law recognizes an action for economic duress?
   A. What is meant by the terms "wrongful" or "unlawful" when used in connection with the conduct of the party against whom economic duress is applied?
   B. Must the wrongful or unlawful acts complained of be committed during the course of settlement negotiations as distinguished from acts which caused the need for negotiations.
   C. What is meant by not accepting a settlement "voluntarily".

   3. Is "economic duress" recognized in the law of Oklahoma as an independent cause of action or a basis for avoiding a mutual release and settlement agreement of claims?
   4. If "economic duress" is recognized in the law of Oklahoma as stated in 3 above, what is its nature, cope and elements?
   5. If Oklahoma law recognizes economic duress:
   A. What manner of "wrongful" or "unlawful" act on the part of the party or parties released caused the economic duress?
   B. Must the wrongful or unlawful acts complained of be committed during the course of settlement negotiations and not merely be the acts which give rise to the claims and the need for negotiations?

ly, and time consuming, Morrison-Knudsen refused Centric's requests for extension of time to compensate for the delays precipitated by Morrison-Knudsen.

Centric also alleged that Morrison-Knudsen knew that mechanical interferences would obstruct its job performance and that this fact was intentionally concealed. Despite this, however, Centric charges that Morrison-Knudsen, in bad faith, materially interfered with its work, subjected Centric to harassment, showed callous unconcern for human life, and then ordered Centric, at its own expense, to accelerate performance of its contract under the threat of termination for non-compliance with Morrison-Knudsen's unreasonable and unwarranted demands. As the result of these allegations, Centric asserted that Morrison-Knudsen substantially and materially breached the construction contract, and that the settlement agreement should be avoided because of misrepresentations, concealments, and economic duress. Centric also alleged that it should recover on a second claim for relief based on Morrison-Knudsen's negligence which caused financial damage to Centric's business.

Upon completing the contract, Centric was paid the $12.5 million dollar contract price and, thereafter, the parties entered into negotiations to settle disputed issues arising from Centric's cost overruns. Centric was represented by counsel from September, 1977, until shortly before the settlement; it opened negotiations with a $2.2 million dollar demand which it later lowered to $1.8 million dollars. Morrison-Knudsen, which Centric alleges was fully aware of its precarious financial position, presented a "take it or leave it" offer of $1.4 million dollars. On April 21, 1978, Centric, which now claims that it had no real alternative but bankruptcy, accepted the counter-offer and executed a settlement agreement.

On December 29, 1978, Centric notified Morrison-Knudsen of its intent to repudiate the settlement agreement, and on July 10, 1980, it instituted an action in the United States District Court for the Western District of Oklahoma to set aside the settlement agreement alleging economic duress.

Centric charged that Morrison-Knudsen's breach of contract and negligence resulted in substantially increased costs creating losses of $3.4 million dollars, placing Centric on the brink of financial disaster. Centric alleged that at the time it bid on the General Motors project it was successful and financially secure; and, that as the direct result of losses incurred on this job, it suffered cash flow problems, was unable to raise additional capital, borrow money, or secure bonding. The federal district court sustained Morrison-Knudsen's motion for summary judgment after finding that Oklahoma law does not recognize economic duress and even if it did, the doctrine is confined to unlawful settlements induced by unlawful acts committed during the course of negotiations, as distinguished from acts necessitating negotiation. Centric appealed to the Tenth Circuit Court of Appeals.

On August 14, 1980, almost simultaneously with the filing of the federal case, Centric filed an action in the district court of the State of Oklahoma against the Oklahoma Industrial Authority. Sometime later, the Authority filed a motion for summary judgment which was overruled by the trial court as was the Authority's subsequent motion to reconsider. Four days after the federal district court granted summary judgment, the Authority renewed its motion for summary judgment, and this time the trial court granted the motion. On appeal from the state court action, the Oklahoma Court of Appeals held that controversial material facts existed concerning whether the settlement agreement was signed under economic duress, and it ordered the cause reversed and remanded. The Oklahoma Supreme Court denied certiorari on February 26, 1986.

## I

### ECONOMIC DURESS MAY BE A BASIS FOR AVOIDING A MUTUAL RELEASE AND SETTLEMENT OF CLAIMS.

■ The rationale underlying the principle of economic duress is the imposition of certain minimal standards of business ethics in the market place. Hard bargaining,

efficient breaches, and reasonable settlements of good faith disputes are acceptable, even desirable, in our economic system. However, the minimum standards are not limited to precepts of rationality and self-interest—they include equitable notions of fairness and propriety which preclude the wrongful exploitation of business exigencies to obtain disproportionate exchanges of value which, in turn, undermine the freedom to contract and the proper functioning of the system. The doctrine of economic duress comes into play *only* when conventional alternatives and remedies are unavailable to correct abberational abuse of these norms. It is available solely to prevent injustice, not to create injustice.[2]

Compromises are favored in the law, and because litigants should turn to the courts only as a last resort, a necessary legal tension exists between enforcement of valid settlement agreements and those obtained through misrepresentation, fraud, or economic duress. Courts are reluctant to set aside agreements or to interfere with the freedom of contract because of the desirability of finality in private dispute resolutions. However, there is an increasing recognition of the court's role in correcting inequitable or unequal exchanges between parties of disproportionate bargaining power, and courts are becoming more skittish about enforcing agreements which were entered into under coercive circumstances.[3] The majority of jurisdictions now hold that settlement agreements are not impervious to a valid attack under the doctrine of economic duress.[4]

A settlement agreement coerced by economic duress may be avoided depending on

---

**2.** *Rich & Whillock, Inc. v. Ashton Development, Inc.,* 157 Cal.App.3d 1154, 204 Cal.Rptr. 86, 89 (4th Dist.1984); *International Paper Co. v. Whilden,* 469 So.2d 560, 563 (Okla.1985).

**3.** *Totem Marine T. & B. v. Alyeska Pipeline Service Co.,* 584 P.2d 15, 21, 9 A.L.R. 4th 928 (Alas. 1978); *Rich & Whillock, Inc. v. Ashton Development Inc.,* note 2 supra; The necessity for the doctrine in the cases cited have been explained in Dalzell, "Duress by Economic Pressure", 20 N.C.L.Rev. 341, 370 (1942):

"Nowadays, a wait of even a few weeks in collecting on a contract claim is sometimes serious or fatal for an enterprise at a crisis in its history. The business of a creditor in financial straits is at the mercy of an unscrupulous debtor, who need only suggest that if the creditor does not care to settle on the debtor's own hard terms, he can sue. This situation, in which promptness in payment is vastly more important than even approximate justice in the settlement terms, is too common in modern business relations to be ignored by society and the courts."

**4.** The following cases recognize the doctrine of economic duress:

*Chouinard v. Chouinard,* 568 F.2d 430, 434 (5th Cir.1978); *Jamestown Farmers Elevator, Inc. v. General Mills,* 552 F.2d 1285, 1290 (8th Cir.1977); *LaBeach v. Beatrice Foods Co.,* 461 F.Supp. 152, 156 (S.D.N.Y.1978); *Rivervalley Co. v. Deposit Guaranty Nat. Bank,* 331 F.Supp. 698, 706 (N.D.Miss.1971); *Wurtz v. Fleischman,* 197 Wis.2d 100, 293 N.W.2d 155, 160, 12 A.L.R.4th 1254 (1980); *Totem Marine T. & B. v. Alyeska Pipeline Service Co.,* 584 P.2d 15, 21, 9 A.L.R.4th 928 (Alas.1978); *Cheshire Oil Co., Inc. v. Springfield Realty Corp.,* 118 N.H. 232, 385 A.2d 835, 838 (1978); *Duke City Lumber Co., Inc. v. Terrel,* 88 N.M. 299, 540 P.2d 229, 231 (1975); *Sheraton Hawaii Corp. v. Poston,* 51 Haw. 172, 454 P.2d 369, 372 (1969); *Capps v. Georgia Pacific Corporation,* 253 Or. 248 453 P.2d 935, 939 (1969); *McNussen v. Graybeal,* 146 Mont. 173, 405 P.2d 447, 454 (1965); *Inland Empire Refineries v. Jones,* 69 Idaho 335, 206 P.2d 519, 522 (1949); *Steinger v. Smith,* 358 Mo. 39, 213 S.W.2d 396, 400 (1948); *Norton v. Michigan State Highway Dept.,* 315 Mich. 313, 24 N.W.2d 132, 135 (1946); *Manhattan Milling Co. v. Manhattan Gas & Elec. Co.,* 115 Kan 712, 225 P. 86, 88 (1924); *Johnson v. Ford,* 147 Tenn. 63, 245 S.W. 531, 536 (1922); *Bither v. Packard,* 115 Me. 306, 98 A. 929, 932 (1916); *Redford v. Weller,* 27 S.D. 334, 131 N.W. 296–97 (1911); *Harris v. Cary,* 112 Va. 362, 71 S.E. 551, 553 (1911); *March v. Bricklayers & Plasterer's Union No. 1,* 79 Conn. 7, 63 A. 291, 293 (1906); *First National Bank v. Sargent,* 65 Neb. 594, 91 N.W. 595, 597 (1902); *New Orleans & N.E.R. Co. v. Louisiana Const. & Imp. Co.,* 109 La. 13, 33 So. 51, 55 (1902); *Buford v. Lonergan,* 6 Utah 301, 22 P. 164, 167, affirmed in 148 U.S. 58 581, 13 S.Ct. 684, 37 L.Ed. 569 (1893); *Joannin v. Ogilvie,* 49 Minn. 557, 52 N.W. 217–18 (1892); *Rich & Whillock v. Ashton Development,* 157 Cal.App.3d 1154, 204 Cal.Rptr. 86, 89 (4th Dist.1984); *Charter Medical Management v. Ware Manor,* 159 Ga.App. 378, 283 S.E.2d 330, 334 (1981); *Johnson v. American National Insurance Co.,* 126 Ariz. 219, 613 P.2d 1275, 1281 (1980); *Mancino v. Friedman,* 69 Ohio App.2d 30, 23 Ohio 3d 27, 429 N.E.2d 1181, 1186 (1980); *Wiesen v. Short,* 43 Colo.App. 374, 604 P.2d 1191–92 (1979); *Barker v. Walter Hogan Enterprises, Inc.,* 23 Wash.App. 450, 596 P.2d 1359–60 (1979); *Inter. Underwriters Cont'rs v. New England T & T Co.,* 8 Mass.App. 340, 393 N.E.2d

the facts of each case.[5] In *Samuels Shoe Co. v. Frensley*, 151 Okla. 196, 3 P.2d 216, 221 (1931), this Court, after finding that a mortgage procured from a father by threats of the arrest and prosecution of his son could be set aside regardless of the son's innocence or guilt, held that:

1. Duress exists if one, by the unlawful act of another, is induced to make a contract or perform some act under circumstances depriving one of the exercise of a free will.

2. Duress exists if one is deprived of an unfettered will or understanding, by threats or other unlawful means, resulting in an involuntary execution of a contract.

3. The existence of duress is measured not by the nature of the acts or threats but by the state of mind induced by the threats or acts.

4. If the threats extinguish the exercise of free will power, the contract may be avoided for duress.

The lone dissenter in *Samuels* clung to the common law's notion of duress, and argued that the Court's evolutionary doctrine ignored the explicit language contained in Comp.St.1921 § 4993 (first codified in 1910 and recodified unchanged as 15 O.S. 1981 § 55),[6] and that the Court had circumvented the statutory requirement that duress must, among other things, result in false imprisonment.[7] This Court, in *Newsom v. Medis*, 205 Okla. 574, 239 P.2d 784,786 (1952), acknowledged that the common law rule had been relaxed and that duress may consist of acts other than those proscribed by 15 O.S. 1981 § 55.

At common law, actionable duress was limited to false imprisonment and threats of physical violence or serious bodily harm culminating in a grossly unfair transaction. Duress was tested by whether the threat would overcome the will of a person of ordinary firmness, ignoring the unique characteristics and individual weaknesses of the victim. This purportedly objective test obviated the defense of economic duress for those who did not measure up to the legal standard of ordinary firmness, courage, and will.

The evolving common law,[8] while acknowledging that business compulsion differs somewhat from duress, recognizes the expansion of the doctrine of duress, and acknowledges economic duress/business compulsion as a species of duress—as common law duress clothed in "modern dress."[9] In its present form, the doctrine is not limited by the early statutory and judicial expressions requiring an unlawful act in the nature of a separate tort or a crime. Rather, in most jurisdictions the doctrine may come into play upon the commission of a wrongful act which is sufficiently coercive to cause the person, faced with no reasonable alternative, to succumb

968, 970 (1979); *Spillers v. Five Points Guaranty Bank,* 335 So.2d 851, 853 (Fla.App.1976); *National Auto Brokers Corp. v. Aleeda Dev. Corp.,* 243 Pa.Super. 101, 364 A.2d 470, 473 (1976); *S.P. Dunham & Co. v. Kudra,* 44 N.J.Super 565, 131 A.2d 306, 309 (1957); *King Construction Co. v. W.M. Smith Electric Co.,* 350 S.W.2d 940, 944 (Tex.App.1961); *Fowler C. Mumford,* 48 Del. 282, 102 A.2d 535, 538 (1954).

5. See *Anderson v. Kelley,* 57 Okla. 109, 156 P. 1167, 1169 (1916); Dawson, "Economic Duress—An Essay In Perspective," 45 Mich.L.Rev. 253, 289 (1947).

6. It is provided by 15 O.S. 1981 § 55:
"Duress consists in:
1. Unlawful confinement of the person of the party, or of husband or wife of such party, or of an ancestor, descendant, or adopted child of such party, husband or wife.

2. Unlawful detention of the property of any such person; or,
3. Confinement of such person, lawful in form, but fraudulently obtained, or fraudulently made unjustly, harassing or oppressive."

7. *Samuels Shoe Co. v. Frensley,* 151 Okla. 196, 3 P.2d 216, 222 (1931).

8. See *Brigance v. Velvet Dove Restaurant,* 725 P.2d 300 (Okla.1986).

9. *Marrazzo v. Orino,* 194 Wash. 364, 78 P.2d 181, 186 (1938); See also Annot., "Doctrine of Business Compulsion," 79 A.L.R. 655 (1932) for citation of cases recognizing economic duress/business compulsion as an evolved form of common law duress.

to the perpetrator's pressure.[10] More recently, economic duress has been interjected as a defense in actions to enforce contracts, an independent tort action for damages resulting from a coerced contract,[11] a predicate for restitution actions, and as the basis for invalidating settlement agreements.[12]

In general, the coercing party has been subjected to legal sanctions if his/her/its actions or threats caused impaired bargaining power, regardless of whether the impairment consisted of economic necessity, mental or physical disability, or a vast disparity in knowledge or experience.[13] Without totally abandoning the ordinary firmness test or adopting the "eggshell" victim test—that is, one who may be predisposed to crumbling under pressure—we find that application of the doctrine of economic duress/business compulsion [14] should turn on the more conservative approach of whether the wrongful act is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure.[15]

Although Oklahoma courts have never used the specific nomenclature "economic duress", Oklahoma has implicitly acknowledged, at least since *Samuels*, that contracts may be avoided because of economic duress/business compulsion.[16] The elements comprising economic duress are:

---

**10.** *Totem Marine T. & B. v. Alyeska Pipeline Service Co.,* 584 P.2d 15, 21, 9 A.L.R. 4th 928 (Alas.1978); Dalzell, "Duress by Economic Pressure," 20 N.C.L.Rev. 237, 377 (1942); 13 S. Williston, "A Treatise On the Law of Contracts", p. 656, § 1602 (3d. ed. 1970).

**11.** We need not decide whether economic duress is an independent tort because Oklahoma law has long permitted avoidance of coerced settlement agreements.

**12.** Note, "Economic Duress After The Demise of Free Will Theory: A Proposed Tort Analysis," 53 Iowa L.Rev. 892 (1968).

**13.** *Totem Marine T. & B. v. Alyeska Pipeline Service Co,* see note 9 supra; see Dawson, "Economic Duress—An Essay in Perspective," see note 5 at p. 264, supra. See also 13 Williston "A Treatise on the Law of Contracts", p. 668, § 1605 (3rd ed. 1970) for citations of cases measuring duress based on the attributes of the alleged victim. The rationale for this position was explained by the Kansas Supreme court in *Ogle v. Freeman,* 150 Kan. 864, 96 P.2d 670, 674 (Kan.1939) when it determined that if a person coerced by use of threats had a mind of less than ordinary firmness, there was all the more reason to afford protection.

**14.** *Starks v. Fields,* 198 Wash. 593, 89 P.2d 513, 515 (1939).

**15.** *Rich & Whillock v. Ashton Development,* see note 2, 204 Cal.Rptr. at p. 89, supra, citing *Leeper v. Beltrami,* 53 Cal.2d 195, 203–05, 1 Cal.Rptr. 12, 347 P.2d 12, 19 (1959).

**16.** In *Sinclair Refining Co. v. Roberts,* 201 Okla. 358, 206 P.2d 193, 197 (1949), economic duress was recognized though not specifically mentioned. In that case, the plaintiff, who was the defendant's commission agent or bulk warehouse dealer brought suit to recover part of the commissions which the defendant had withheld to cover shortages of its petroleum products which the plaintiff was holding for distribution. Roberts alleged that Sinclair's auditors appeared at regular intervals to audit the business. If shortages were discovered Roberts was required to execute a written authorization allowing a deduction from his commission. When Roberts protested he was told that another agent would be found if he refused to sign the settlement. Even though the shortages were not Roberts' fault, he feared that his refusal would result in cancellation of his agency. Because of lack of evidence showing duress this Court reversed the trial court's ruling in favor of Roberts. However, this case clearly deals with the issue of economic duress. After citing 15 O.S. 1981 § 55, the Court restated the rule in *Samuels* as the test for duress.

In *Newsom v. Medis,* 205 Okla. 574, 239 P.2d 784, 786 (1951) the rule was reiterated and the Court said, "To deprive one of his will and understanding by reason of threats or other unlawful means, so that a note thus obtained is not his free and voluntary act, constitutes duress."

*United States v. Bell,* 259 F.Supp. 602, 605 (N.D. Okla.1966) a farmer borrowed money under a special livestock loan act and purchased more cattle than provided for in the loan plan. Because his land was not large enough to pasture the cattle, he had to borrow more money to properly prepare the cattle for market. The loan agreement required the selling of the cattle to pay the balance of the loan in September of that year. In October, the defendant was forced to sell the cattle to comply with the loan agreement. The proceeds from the sale were insufficient to cover the entire loan and a balance of $8,621.42 was due. The bank sued for the balance due and defendant raised the defense of economic duress. The court in this case stated, "the requirement that the cattle must be sold in

A.  The settlement was the result of a wrongful or unlawful act which

(1) was initiated by the coercing party,

(2) was committed with knowledge on the part of the coercing party of the impact it would have,

(3) was made for the purpose of, and reasonably adequate to secure coercion over the other, and

(4) resulted in obtaining undue advantage over the other.

B.  The act or acts complained of in (A) must have deprived the coerced party of its free will, leaving no adequate legal remedy nor reasonable alternative available.  In this respect it is not enough that the alleged victim merely show, for example:

(1) its reluctance to settle,

(2) its financial embarrassment, or

(3) its business necessities.

C.  Detriment to the complaining party caused thereby.

Obviously, each case must rise and fall on its own merits.  The means employed, the age, gender, physical condition, mental characteristics, and the environment of the complaining party are some of the matters which properly may be considered in determining the question.  Generally, the issue is one of fact to be determined after consideration of all the circumstances surrounding the transaction.  Although the question of actual duress is always a question of fact for the jury, the trial court is not required to submit evidence to the jury which does not measure up to the required standard of proof.  In essence, if the existence of the alleged facts pleaded as constituting duress is denied, duress is a jury question;  whether the alleged facts are sufficient to constitute duress is a question of law.[17]

The distillate of the present teaching in the area dovetails nicely with the elements adopted by this Court in *Samuels*.  It is apparent that Oklahoma has long recognized economic duress as a valid basis for avoiding a mutual release and settlement agreement.

## II

## WRONGFUL OR UNLAWFUL ACTS WHICH RESULT IN INVOLUNTARY SETTLEMENTS ARE NOT CONFINED TO SETTLEMENT NEGOTIATIONS.  DEFINITION OF THE TERMS "WRONGFUL", "UNLAWFUL" AND "VOLUNTARILY";

### A.

### WRONGFUL OR UNLAWFUL ACTS ARE NOT CONFINED TO SETTLEMENT NEGOTIATIONS

■  We have found no support for the proposition that the wrongful or unlawful acts which give rise to actions for economic duress action must be committed during the course of settlement negotiations.  Rather, our research indicates a conclusion to the contrary.

In *Aircraft Associates & Mfg. Co. v. United States*, 357 F.2d 373, 378–79 (Ct.Cl. 1966), a buyer contracted for the purchase of surplus aircraft carcasses from the federal government, including the right to remove, intact, certain equipment for resale.  Before salvage operations were begun, the federal government removed several of the parts.  This contributed to losses suffered by the buyer forcing an inadequate settle-

September was not economic duress or business compulsion, one of the elements of actionable duress is that the circumstances permitted the person coerced no other alternative.... Under Oklahoma law duress exists when the *unlawful* act of another induced a person to make a contract, or perform some act, under circumstances depriving him of the exercise of free will ... The committee did not act unlawfully in requiring that the cattle be sold in September."

17.  *Sinclair Refining v. Roberts,* see note 16 supra.  *Anderson v. Kelley,* see note 5 supra;  *Rich & Whillock, Inc., v. Ashton Development, Inc.,* 157 Cal.App.3d 1154, 204 Cal.Rptr. 86, 89–90 (4th Dist.1984);  *Higgins v. Brunswick Corp.,* 76 Ill.App.3d 273, 32 Ill.Dec. 134, 138, 395 N.E.2d 81, 85 (1979);  Dawson, "Economic Duress—An Essay In Perspective," see note 5 supra;  13 S. Williston, "A Treatise on the Law of Contracts", see note 10 at p. 651, supra.

ment agreement. Therafter, the buyer sought to void the settlement agreement alleging economic duress. In finding for the buyer, the Circuit Court of Appeals held that the government's wrongful removal of the parts caused or contributed to the buyer's financial difficulties and that governmental threats made to secure the release, constituted economic duress. Relying on *James Shewan & Sons v. United States*, 73 Ct.Cl. 49 (1931), the Court held that the government defendant could not be permitted to take advantage of its own failure to perform a solemn contractual obligation in order to extract a surrender of rights from the other party.

*Totem Marine T. & B. v. Alyeska Pipeline Service Co.*, 584 P.2d 15, 23, 9 A.L.R.4th 928 (Alas.1978) is the lead case in the arena of economic duress. Totem contracted with Alyeska to transport pipeline construction materials from Houston, Texas, to a port in southern Alaska, anticipating one or two cargo stops along the way. Totem chartered the equipment necessary to perform the contract. However, from the beginning several unanticipated problems arose which impeded Totem's performance. When Totem's chartered tugs and barge arrived in the port of Long Beach, California, Alyeska had the barge unloaded and unilaterally terminated the contract. Totem submitted termination invoices totalling somewhere between $260,-000 and $300,000, and notified Alyeska that without immediate payment it would be forced into bankruptcy. After some negotiations, Alyeska offered to settle Totem's account for $97,500. In order to avoid bankruptcy, Totem accepted the counteroffer and signed an agreement releasing Alyeska from all claims under the contract.

About four months after signing the release *Totem* sued Alyeska for the balance due under the contract. The trial court entered summary judgment for Alyeska based on the settlement agreement; the Supreme Court of Alaska reversed, explaining:

"[W]e believe that Totem's allegations, if proved, would support a finding that it executed a release of its contract claims against Alyeska under economic duress. Totem has alleged that Alyeska deliberately withheld payment of an acknowledged debt, knowing that Totem had no choice but to accept an inadequate sum in settlement of that debt; that Totem was faced with impending bankruptcy; that Totem was unable to meet its pressing debts other than by accepting the immediate cash payment offered by Alyeska; and that through necessity, Totem thus involuntarily accepted an inadequate settlement offer from Alyeska and executed a release of all claims under the contract. If the release was in fact executed under these circumstances, we think that under the legal principles discussed above that this would constitute the type of wrongful conduct and lack of alternatives that would render the release voidable by Totem on the ground of economic duress."

In a recent California case, *Rich Whillock, Inc. v. Ashton Development, Inc.*, 157 Cal.App.3d 1154, 1165, 204 Cal.Rptr. 86 (4th Dist.1984), the court held that a subcontractor was not precluded by a release and settlement from recovering the actual balance due on the contract because the settlement agreement had been obtained as the result of economic duress. The contract exceeded the bid price because of the alleged misfeasance of the general contractor. When a final billing was submitted, the general contractor offered "$50,000 or nothing". At the time of the settlement offer, the contractor knew that the subcontractor was overextended, and that it faced imminent backruptcy if the final bills were not paid. The subcontractor strenuously objected to the contractor's coercive tactics and agreed to the settlement only to avoid impending economic disaster and the adverse ripple effects its potential bankruptcy would have on its creditors. Under these circumstances, the court found that the release and settlement were the products of economic duress.

It is obvious that in *Totem* and in *Rich & Whillock* the wrongful or unlawful acts were committed before settlement began.

Our analysis leads us to the conclusion that neither Oklahoma's duress statute nor Oklahoma case law require that the unlawful or wrongful actions constituting economic duress be committed during the course of settlement negotiations.

## B.

### THE TERMS "WRONGFUL" OR "UNLAWFUL" ARE NOT SYNONYMS FOR "ILLEGAL"

■ Because the presence of an unlawful or wrongful act is a prerequisite to the finding of economic duress, it is incumbent upon us to define the terms "wrongful" or "unlawful". Again, the determining factor is the circumstances under which the threats were made.[18] "Unlawful" and/or "wrongful" are not synonymous with "illegal". The key is that the threatened action presents an unreasonable alternative to the weaker party within the confines of a bargaining situation. Economic duress may be found if the act is done under circumstances which are considered wrongful even if there was a legal right to perform the threatened act. The wrongfulness of the coercer's conduct derives from the fact that the threatened party was forced to accept the contract, not from any inherent wrongfulness of the act threatened. Ordinarily a party may threaten to do what is lawful; however, a coercer's threats may be wrongful even though the threatened action would have been legal. The key factor, therefore, must be the fact that the threatened action is an unreasonable alternative to an injurious contractual demand in a bargaining situation. The wrongfulness of the coercer's conduct must be related to the unreasonableness of the alternatives which he presents to the weaker party, and the inherent wrongfulness of either alternative is relevant only insofar as it shows the unreasonableness of the alternatives.[19] "Unlawful" when applied to promises, agreements, contracts and considerations, means that the agreements are legally ineffective because they were obtained by bad faith coercion or compulsion, even though the acts may not be illegal *per se*.[20]

## C.

### THE TERM "VOLUNTARILY" CONNOTES AN UNFETTERED WILL

■ The term, "voluntarily" encompasses the exercise of the will with a deliberate choice between two or more known courses of action.[21] The distinction between voluntary settlements and negotiations under duress has long been a fruitful theme of discussion by the courts. In *Hubbard v. Jones*, 103 Okla. 276, 278 229 P. 516, 518 (1924), this Court cited *Swift & Courtney & Beecher Co. v. United States*, 111 U.S. 22, 28, 4 S.Ct. 244, 247, 28 L.Ed. 341 (1884) in which the United States Supreme Court held that: if the parties are not on equal terms; if the payor has no choice, if the only alternative is to submit to an illegal extraction or discontinue business—these and other like circumstances evidencing pressure or duress under which money or other value is parted with are not regarded as a voluntary acts within the meaning of the maxim *volenti non fit injuria*.

In *Lonergan v. Buford*, 148 U.S. 581, 13 S.Ct. 684, 687, 37 L.Ed. 569 (1893) the United States Supreme Court held that to constitute duress sufficient to make an agree-

18. See note 10 supra.

19. 13 S. Williston, "A Treatise On The Law of Contracts", p. 680–81, § 1607 (3rd. ed. 1970); Note, "Economic Duress After The Demise of Free Will Theory: A Proposed Tort Analysis" see note 12 at p. 898–99 supra; Note, "Contracts—Economic Duress," 28 S.Cal.L.Rev. 317–18 (1955).

20. *Eckstein v. Eckstein*, 38 Md.App. 506, 379 A.2d 757, 763 (Md.1978); *Conine v. Leikam*, 570 P.2d 1156, 1159 (Okla.1977); *Link v. Link*, 278 N.C. 181, 179 S.E.2d 697, 705 (1971); *Gerber v. First Nat'l Bank of Lincolnwood*, 30 Ill.App.3d 776, 332 N.E.2d 615, 618, 79 A.L.R.3d 592 (1975); *Fowler v. Mumford*, 48 Del. 282, 102 A.2d 535, 538 (1954).

21. *Eckstein v. Eckstein, id.; R.T. Realty, Inc. v. Downes*, 14 Misc.2d 322, 182 N.Y.S.2d 79, 82 (1958).

ment involuntary, there must be some actual or threatened exercise of power possessed, or believed to be possessed, by the party extracting (or denying) payment from the other from which there is no immediate relief other than acceptance of the coercive terms.

In reaffirming the longstanding doctrine of economic duress as a basis for invalidating settlement agreements, *we express no opinion on whether the facts in this case are sufficient to support a finding of economic duress,* and we need not determine here whether Oklahoma recognizes economic compulsion as an independent tort. These are questions to be determined another day.

DOOLIN, V.C.J., and LAVENDER, WILSON and SUMMERS, JJ., concur.

OPALA, J., concurs in part and dissents in part.

SIMMS, C.J., and HODGES and HARGRAVE, JJ., dissent.