2015 OK CIV APP 59

**Ralph BREWER and Karen Brewer, Plaintiffs/Appellees,**

v.

**J–SIX FARMS, L.P., Defendant/Appellant.**

**No. 112,656.**

Court of Civil Appeals of Oklahoma, Division No. 3.

March 20, 2015.

Jack Mattingly, Jr., Mattingly & Roselius, P.L.L.C., Seminole, Oklahoma, for Appellees.

Jon Vorndran, George Wright, Stuart & Clover, P.L.L.C., Shawnee, Oklahoma, for Appellant.

LARRY JOPLIN, Judge.

¶ 1 Defendant/Appellant J–Six Farms, L.P. (J–Six or Defendant), seeks review of the trial court's order granting judgment to Plaintiffs/Appellees Ralph Brewer and Karen Brewer (individually, by name, or collectively, Plaintiffs) in Plaintiffs' action to recover damages for breach of contract. In this appeal, Defendant asserts the trial court erred as a matter of law and abused its discretion in granting judgment to Plaintiffs.

¶ 2 Plaintiffs are "growers," in the business of raising and selling "weaner" piglets. Plaintiffs' business is limited to raising piglets only for that period of time between delivery of a litter of piglets by a mother sow until the piglets are about three weeks old when they are weaned from the mother and the "weaner" pigs are then sold to a third party.

¶ 3 Defendant is in the business of raising pigs for sale as "market" hogs. Defendant buys weaner pigs from "growers" like the Plaintiffs, raises the weaner pigs to maturity, and sells the mature "market" hogs for pork production.

¶ 4 In early 2009, Plaintiffs and Defendant entered into a contract for sale and purchase of weaner pigs. The contract called for the Plaintiffs' sale of weaner pigs to Defendant at an "index" price, set according to the Chicago Mercantile Exchange lean hog futures price, but, regardless of the index price, not less than a floor price of $32.00 per piglet, nor more than a ceiling price of $42.00 per piglet. On the issue of the "termination," the contract provided:

Material breach or default of this Agreement shall be grounds for termination before the end of the contractual term; provided in the event of a material breach or default of this Agreement, the aggrieved party must provide written notice to the breaching or defaulting party. If the breach or default is capable of being cured, then the party in breach or default shall have seventy-two (72) hours to cure said breach or default and prevent termination.

The contract also contained an "entirety" clause:

Parole Evidence. This Agreement is the entire agreement of the parties, and it may not be supplemented or amended unless in writing, signed by each party. Any agreements, additions or amendments to this contract are not enforceable or admissible unless signed by each party to this Agreement.

¶ 5 In April 2009, market prices for pork began to fall. On or about June 9, 2009, Defendant advised Plaintiffs it would reduce the price paid for piglets by $10.00 per head, and would begin to repay the deficiency between the price paid and the contract price when market price at the time of sale rose above Defendant's expenses. According to Defendant, and as an additional accommodation for the price reduction, Defendant offered to allow Plaintiffs to purchase semen and vaccinations from Defendant's supplier at a reduced cost to be recovered from the proceeds of sale of market hogs.

¶ 6 During a subsequent conference call between Plaintiffs and Defendant, Karen Brewer objected to the price reduction as resulting in inadequate compensation to pay Plaintiffs' expenses and debt service, and demanded compliance with the contract. Defendant nevertheless averred the parties orally agreed to the modification of the contract. However, Plaintiffs, through their attorney, wrote Defendant a letter, dated June 11, 2009, advising Defendant they could not accept the "lower swine prices given their current operating costs."

¶ 7 Plaintiffs nevertheless continued to deliver weaner piglets to Defendant, for which Defendant paid the reduced price. In September 2009, with hog market prices recovering, Defendant reduced its per-head deduction from the purchase price to $5.00 per head.

¶ 8 In November 2009, Defendant ceased any deduction from the purchase price, and notified Plaintiffs it would begin to repay the deficiency between the price paid and the contract price. According to Plaintiffs, they repeatedly asked Defendant how repayment would be structured, and conferred by phone with Defendant's representative on the issue. Although Defendant averred the repayment plan was satisfactorily explained during the phone call, Plaintiffs sent Defendant an e-mail on January 20, 2010, asking for additional clarification of the repayment plan, but Plaintiffs asserted Defendant did not respond.

¶ 9 Plaintiffs continued to deliver weaner pigs to Defendant, for which Defendant paid the contract price. By November 2010, the hog market had recovered, and, according to Defendant, it was paying Plaintiffs the contract ceiling price for weaner piglets.

¶ 10 Plaintiffs delivered loads of piglets to Defendant on November 23 and November 30, 2010. By correspondence dated November 29, 2010, however, Plaintiffs notified Defendant, in writing, that Defendant's failure to pay the full contract price constituted a material breach of contract, advised Defendant that it owed them an additional $31,243.24 under the contract, and expressed their intent to terminate the contract if De-

fendant did not pay the sum owed within 72 hours. On December 7, 2010, Defendant responded, and refused to pay for the last shipments of piglets until outstanding charges for semen, medicine and royalties due its vendor were collected.

¶ 11 On December 22, 2010, Plaintiffs commenced the instant action, seeking damages for Defendant's alleged breach of contract. Defendant asserted counter-claims, and alleged breach of contract by Plaintiffs.

¶ 12 The parties appeared for non-jury trial on December 17, 2013. Plaintiffs testified they negotiated the floor contract price as the minimum price they could accept in order to pay their operating expenses and debt service. Plaintiffs further testified that, in June 2009, because they had no other purchaser for their weaner pigs, and because the market price for pigs was then below even the reduced price offered by Defendant, they had no choice but to accept Defendant's reduced payments. Plaintiffs also asserted they had not agreed to, or entered a contract for, the purchase of semen and medicine from Defendant's vendor.

¶ 13 Plaintiffs presented evidence demonstrating the market price for hogs fell below the floor contract price for only five weeks between June 26, 2009 and August 28, 2009, the market hog price rose above the contract ceiling during December 2009, and Defendant continued to pay the below-contract price until November 2009, notwithstanding recovery of the hog market. Plaintiffs produced an itemized statement demonstrating Defendant's underpayment of more than $36,000.00 they alleged was due under the contract.

¶ 14 Defendant asserted that the combination of the market decline and pressure by its own bank required it to reduce the price it paid for weaner piglets. Defendant estimated the cost of semen provided to Plaintiffs at slightly more than $3,200.00, and asserted there were additional royalties payable to the semen supplier. Defendant alleged that, upon Plaintiffs' termination of the contract, it was required to purchase weaner piglets on the open market at a substantially higher price than it would have paid under the parties' contract.

¶ 15 On consideration of the testimony and evidence, the trial court granted judgment to Plaintiffs, and awarded damages in the sum of $36,021.77. By post-judgment order, the trial court also granted attorney's fees and costs to Plaintiffs.

¶ 16 Defendant appeals, and, in four propositions, Defendant asserts the contract between Plaintiffs and Defendant constitutes a contract for the sale of goods, governed by the provisions of the Oklahoma Uniform Commercial Code, 12A O.S. §§ 1–101, et seq. In its fifth proposition, Defendant asserts that, because the trial court erred in granting judgment to Plaintiffs, the trial court also erred in granting to Plaintiffs prevailing party attorney's fees and costs.

¶ 17 "In a non-jury trial the trial judge acts as the trier of fact and those findings are entitled to the same weight and consideration that would be given to a jury's verdict." *Hagen v. Independent School Dist. No. I–004*, 2007 OK 19, ¶ 7, 157 P.3d 738, 740. (Citations omitted.) "In an action at law the findings of fact by the trial court have the same force and effect as the verdict of a jury, and those findings will not be disturbed upon appeal where there is any evidence reasonably tending to support the findings." *Id.* "Thus, on appeal, we must accept the findings of fact made by the trier of fact if those findings are supported by competent evidence." *Id.*

¶ 18 In its first proposition, Defendant asserts its temporary underpayment for weaner piglets did not constitute a breach or cancellation of the contract, and that Plaintiffs did not, within a reasonable time after the purported breach in June 2009, either declare the contract "cancelled" as that term is defined by the UCC, 12A O.S. § 2–106(4),[1] or invoke their remedies under 12A O.S. § 2–703.[2] So, says Defendant, because Plaintiffs failed to demand recovery of the underpayment under the contract within a commer-

---

1. " 'Cancellation' occurs when either party puts an end to the contract for breach by the other and its effect is the same as that of 'termination' except that the canceling party also retains any remedy for breach of the whole contract or any unperformed balance...."

2. "Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment

cially reasonable time as required by 12A O.S. § 2–709(1),[3] Plaintiffs were not entitled to recover damages.

¶ 19 We disagree. First, the parties' contract permits "termination" of the contract in the event of a "material breach" or "default," and there is no indication the parties intended to restrict "termination" of the contract only for reasons "otherwise than for its breach" as the term, "termination," is defined by the UCC. *See*, 12A O.S. § 2–106(3).[4] Rather, the plain language of the contract clearly permits "termination" of the contract in the event of a "material breach" or "default" under the contract's terms.

¶ 20 Second, § 2–703(e) permits the aggrieved seller "to recover damages for nonacceptance or in a proper case the [contract] ·price," while § 2–709(1) permits the seller to recover both the price of goods accepted and the price of "goods identified to the contract if the . . . the circumstances reasonably indicate that such effort [to resell goods identified to the contract] will be unavailing." The phrase, "within a commercially reasonable time," as used in § 2–709(1)(b) clearly describes when the risk of loss passes to the buyer, and does not limit the ability of the seller to recover the contract price, particularly where, as here, the evidence arguably demonstrates that, due to the lack of other buyers and the depressed market hog prices, resale of the weaner piglets would have been unavailing.

¶ 21 In the alternative, Defendant asserts in its second proposition that, if the original contract was terminated or cancelled in June 2009, the parties entered a new or modified contract at that time. Here, Defendant argues that Plaintiffs are "merchants" as defined by the UCC, § 2–104(1),[5] and, pursuant to § 2–201(1),[6] § 2–201(2),[7] § 2–201(3)(c)[8] and § 2–204,[9] the parties entered a modified contract or contract by novation upon cancellation or termination of the original contract.

---

due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (Section 2–612), then also with respect to the whole undelivered balance, the aggrieved seller may (a) withhold delivery of such goods; (b) stop delivery by any bailee as hereafter provided (Section 2–705); (c) proceed under the next section respecting goods still unidentified to the contract; (d) resell and recover damages as hereafter provided (Section 2–706); (e) recover damages for nonacceptance (Section 2–708) or in a proper case the price (Section 2–709); (f) cancel."

3. "When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price (a) of goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer; and (b) of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing."

4. " 'Termination' occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach. On 'termination' all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives."

5. " 'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."

6. "Except as otherwise provided in this section a contract for the sale of goods for the price of Five Hundred Dollars ($500.00) or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing."

7. "Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten (10) days after it is received."

8. "A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable . . . with respect to goods for which payment has been made and accepted or which have been received and accepted (Section 2–606)."

¶ 22 The parties' contract required · all amendments or modifications to be in writing, and conditioned the effectiveness of any modifications or amendments on the existence of a writing memorializing the modification or amendment signed by both parties. There is absolutely no evidence of any writing, signed by both parties, evincing the parties' agreement to any modification or amendment of the original contract.

¶ 23 According to Plaintiffs, Defendant unilaterally, and without their express agreement, announced it would pay less than the contractual minimum for weaner piglets until the market recovered. Also according to Plaintiffs, and due to (1) the press of their own operating expenses and debt service, (2) the depressed market price of hogs, and (3) the lack of other buyers, they could not have then declared a termination of the contract for a material breach of its terms and were forced to accept payment of less than the contract price for their weaner pigs as a matter of economic duress. *See, Centric Corp. v. Morrison–Knudsen Co.*, 1986 OK 83, ¶ 14, 731 P.2d 411, 416–417.[10]

¶ 24 Under these circumstances, the evidence demonstrates, at best, the parties' implied agreement for the Defendant's temporary payment, and Plaintiffs' temporary acceptance, of sums less than the contract price for weaner piglets delivered until the market recovered. · The evidence does not demonstrate any express or implied agreement by Plaintiffs to accept less than the price for weaner piglets specified by the contract for the entire contract term. Plaintiffs presented evidence of Defendant's underpayment of the price specified by the contract for weaner piglets delivered. The record contains competent evidence to support the trial court's judgment.

¶ 25 In its third proposition, Defendant asserts that, pursuant to 12A O.S. § 6–215,[11] the doctrine of commercial impracticability excused its full performance under the original contract. Here, Defendant asserts the unforeseen depression of hog market prices excused its payment of less than the contract price for weaner piglets.

¶ 26 We disagree. As pointed out by Plaintiffs, first, § 2–615 specifically excuses performance by a "seller," not a "purchaser." Second, the parties negotiated a "floor" price, providing for the minimum purchase price of weaner pigs, and arguably demonstrates the parties appreciated that market hog prices

9. "(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract. (2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined. (3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."

10. "The elements comprising economic duress are: A. The settlement was the result of a wrongful or unlawful act which (1) was initiated by the coercing party, (2) was committed with knowledge on the part of the coercing party of the impact it would have, (3) was made for the purpose of, and reasonably adequate to secure coercion over the other, and (4) resulted in obtaining undue advantage over the other[;] B. The act or acts complained of in (A) must have deprived the coerced party of its free will, leaving no adequate legal remedy nor reasonable alternative available. In this respect it is not enough that the alleged victim merely show, for example: (1) its reluctance to settle, (2) its financial embarrassment, or (3) its business necessities[;] [and]

C. Detriment to the complaining party caused thereby."

11. "Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance: (a) Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid. (b) Where the [causes] mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable. (c) The seller must notify the buyer seasonably that there will be delay or nondelivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer."

might fall, so that the fall of market hog prices below the floor price was not an unforeseen event for which § 2–615 might excuse performance. Third, Defendant reduced the purchase price paid for weaner piglets before the price of market hogs fell below the floor price of the contract. Fourth, and beyond the allegation of restraints and demands imposed by Defendant's bank, Defendant presented no evidence of its inability to pay the minimum contract price.

¶ 27 In its fourth proposition, Defendant asserts Plaintiffs are liable to pay for the semen and supplies obtained from Defendant's vendor under § 2–722.[12] Here, Defendant argues that § 2–722 imposed on Plaintiffs the obligation to pay both for semen and supplies obtained from Defendant's vendor, and royalties payable to Defendant's vendor upon sale of the market hogs.

¶ 28 In the present case, however, Defendant could only "estimate" the sums he believed Plaintiffs should be liable to pay. In the absence of admissible evidence demonstrating the sums Defendant claimed Plaintiffs owed with any certainty or particularity, we reject this proposition.

¶ 29 In its fifth proposition, Defendant asserts the trial court erred in granting attorney's fees and costs to Plaintiffs. Here, Defendant argues that, because the trial court erred in granting judgment to Plaintiffs, the Plaintiffs were not entitled to attorney's fees as prevailing parties under 12 O.S. § 936.

¶ 30 We find no error as alleged. First, the trial court's judgment for Plaintiffs on the claim of breach of contract is free of legal error and supported by competent evidence. Second, Defendant has failed to preserve the alleged error in awarding attorney's fees to Plaintiffs by the timely filing of an amended petition in error to challenge the post-trial order granting attorney's fees and costs to Plaintiffs. *See*, Okla.Sup.Ct.R. 1.26(d), 12 O.S. Supp.2008, Ch. 15, App. 1.[13] We therefore cannot say the trial court erred in awarding attorney's fees and costs to Plaintiffs as prevailing parties under § 936.

¶ 31 The orders of the trial court are AFFIRMED.

MITCHELL, P.J., and
HETHERINGTON, C.J., concur.

---

12. "Where a third party so deals with goods which have been identified to a contract for sale as to cause actionable injury to a party to that contract (a) a right of action against the third party is in either party to the contract for sale who has title to or a security interest or a special property or an insurable interest in the goods; and if the goods have been destroyed or converted a right of action is also in the party who either bore the risk of loss under the contract for sale or has since the injury assumed that risk as against the other; (b) if at the time of the injury the party plaintiff did not bear the risk of loss as against the other party to the contract for sale and there is no arrangement between them for disposition of the recovery, his suit or settlement is, subject to his own interest, as a fiduciary for the other party to the contract; (c) either party may with the consent of the other sue for the benefit of whom it may concern."

13. "Post-trial Order for Attorney's Fees, Interest, or Costs. An amended petition in error to challenge a post-trial order granting or denying costs, interest, or attorney's fees must be filed with this Court within thirty (30) days of the date of the post-trial order challenged. The amended petition in error may be filed without payment of costs, subject to leave of court which will be granted or withdrawn subsequent to filing. An appellate court may order such an appeal to be redocketed and given a different number upon payment of an accompanying cost deposit...."