OSCN Found Document:BREWER v. J-SIX FARMS, L.P.

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 BREWER v. J-SIX FARMS, L.P.
2015 OK CIV APP 59
350 P.3d 420
Case Number: 112656
Decided: 03/20/2015
Mandate Issued: 06/10/2015
DIVISION III
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION III
Cite as: 2015 OK CIV APP 59, 350 P.3d 420

 

RALPH BREWER and KAREN BREWER, 
Plaintiffs/Appellees,
v.
J-SIX FARMS, L.P., Defendant/Appellant.

APPEAL FROM THE DISTRICT COURT OF
OKFUSKEE COUNTY, 
OKLAHOMA
HONORABLE LAWRENCE W. PARRISH, JUDGE

AFFIRMED

Jack Mattingly, Jr., Mattingly & Roselius, P.L.L.C., Seminole, Oklahoma, 
for Appellees,
Jon Vorndran, George Wright, Stuart & Clover, P.L.L.C., 
Shawnee, Oklahoma, for Appellant.


Larry Joplin, Judge:
¶1 Defendant/Appellant J-Six Farms, L.P. (J-Six or Defendant), seeks review 
of the trial court's order granting judgment to Plaintiffs/Appellees Ralph 
Brewer and Karen Brewer (individually, by name, or collectively, Plaintiffs) in 
Plaintiffs' action to recover damages for breach of contract. In this appeal, 
Defendant asserts the trial court erred as a matter of law and abused its 
discretion in granting judgment to Plaintiffs.
¶2 Plaintiffs are "growers," in the business of raising and selling "weaner" 
piglets. Plaintiffs' business is limited to raising piglets only for that period 
of time between delivery of a litter of piglets by a mother sow until the 
piglets are about three weeks old when they are weaned from the mother and the 
"weaner" pigs are then sold to a third party.
¶3 Defendant is in the business of raising pigs for sale as "market" hogs. 
Defendant buys weaner pigs from "growers" like the Plaintiffs, raises the weaner 
pigs to maturity, and sells the mature "market" hogs for pork production.
¶4 In early 2009, Plaintiffs and Defendant entered into a contract for sale 
and purchase of weaner pigs. The contract called for the Plaintiffs' sale of 
weaner pigs to Defendant at an "index" price, set according to the Chicago 
Mercantile Exchange lean hog futures price, but, regardless of the index price, 
not less than a floor price of $32.00 per piglet, nor more than a ceiling price 
of $42.00 per piglet. On the issue of the "termination," the contract 
provided:

 
 Material breach or default of this Agreement shall be grounds for 
 termination before the end of the contractual term; provided in the event of 
 a material breach or default of this Agreement, the aggrieved party must 
 provide written notice to the breaching or defaulting party. If the breach 
 or default is capable of being cured, then the party in breach or default 
 shall have seventy-two (72) hours to cure said breach or default and prevent 
 termination.
The contract also contained an "entirety" clause:

 
 Parole Evidence. This Agreement is the entire agreement of the parties, 
 and it may not be supplemented or amended unless in writing, signed by each 
 party. Any agreements, additions or amendments to this contract are not 
 enforceable or admissible unless signed by each party to this 
 Agreement.
¶5 In April 2009, market prices for pork began to fall. On or about June 9, 
2009, Defendant advised Plaintiffs it would reduce the price paid for piglets by 
$10.00 per head, and would begin to repay the deficiency between the price paid 
and the contract price when market price at the time of sale rose above 
Defendant's expenses. According to Defendant, and as an additional accommodation 
for the price reduction, Defendant offered to allow Plaintiffs to purchase semen 
and vaccinations from Defendant's supplier at a reduced cost to be recovered 
from the proceeds of sale of market hogs.
¶6 During a subsequent conference call between Plaintiffs and Defendant, 
Karen Brewer objected to the price reduction as resulting in inadequate 
compensation to pay Plaintiffs' expenses and debt service, and demanded 
compliance with the contract. Defendant nevertheless averred the parties orally 
agreed to the modification of the contract. However, Plaintiffs, through their 
attorney, wrote Defendant a letter, dated June 11, 2009, advising Defendant they 
could not accept the "lower swine prices given their current operating 
costs."
¶7 Plaintiffs nevertheless continued to deliver weaner piglets to Defendant, 
for which Defendant paid the reduced price. In September 2009, with hog market 
prices recovering, Defendant reduced its per-head deduction from the purchase 
price to $5.00 per head.
¶8 In November 2009, Defendant ceased any deduction from the purchase price, 
and notified Plaintiffs it would begin to repay the deficiency between the price 
paid and the contract price. According to Plaintiffs, they repeatedly asked 
Defendant how repayment would be structured, and conferred by phone with 
Defendant's representative on the issue. Although Defendant averred the 
repayment plan was satisfactorily explained during the phone call, Plaintiffs 
sent Defendant an e-mail on January 20, 2010, asking for additional 
clarification of the repayment plan, but Plaintiffs asserted Defendant did not 
respond.
¶9 Plaintiffs continued to deliver weaner pigs to Defendant, for which 
Defendant paid the contract price. By November 2010, the hog market had 
recovered, and, according to Defendant, it was paying Plaintiffs the contract 
ceiling price for weaner piglets.
¶10 Plaintiffs delivered loads of piglets to Defendant on November 23 and 
November 30, 2010. By correspondence dated November 29, 2010, however, 
Plaintiffs notified Defendant, in writing, that Defendant's failure to pay the 
full contract price constituted a material breach of contract, advised Defendant 
that it owed them an additional $31,243.24 under the contract, and expressed 
their intent to terminate the contract if Defendant did not pay the sum owed 
within 72 hours. On December 7, 2010, Defendant responded, and refused to pay 
for the last shipments of piglets until outstanding charges for semen, medicine 
and royalties due its vendor were collected.
¶11 On December 22, 2010, Plaintiffs commenced the instant action, seeking 
damages for Defendant's alleged breach of contract. Defendant asserted 
counter-claims, and alleged breach of contract by Plaintiffs.
¶12 The parties appeared for non-jury trial on December 17, 2013. Plaintiffs 
testified they negotiated the floor contract price as the minimum price they 
could accept in order to pay their operating expenses and debt service. 
Plaintiffs further testified that, in June 2009, because they had no other 
purchaser for their weaner pigs, and because the market price for pigs was then 
below even the reduced price offered by Defendant, they had no choice but to 
accept Defendant's reduced payments. Plaintiffs also asserted they had not 
agreed to, or entered a contract for, the purchase of semen and medicine from 
Defendant's vendor.
¶13 Plaintiffs presented evidence demonstrating the market price for hogs 
fell below the floor contract price for only five weeks between June 26, 2009 
and August 28, 2009, the market hog price rose above the contract ceiling during 
December 2009, and Defendant continued to pay the below-contract price until 
November 2009, notwithstanding recovery of the hog market. Plaintiffs produced 
an itemized statement demonstrating Defendant's underpayment of more than 
$36,000.00 they alleged was due under the contract.
¶14 Defendant asserted that the combination of the market decline and 
pressure by its own bank required it to reduce the price it paid for weaner 
piglets. Defendant estimated the cost of semen provided to Plaintiffs at 
slightly more than $3,200.00, and asserted there were additional royalties 
payable to the semen supplier. Defendant alleged that, upon Plaintiffs' 
termination of the contract, it was required to purchase weaner piglets on the 
open market at a substantially higher price than it would have paid under the 
parties' contract.
¶15 On consideration of the testimony and evidence, the trial court granted 
judgment to Plaintiffs, and awarded damages in the sum of $36,021.77. By 
post-judgment order, the trial court also granted attorney's fees and costs to 
Plaintiffs.
¶16 Defendant appeals, and, in four propositions, Defendant asserts the 
contract between Plaintiffs and Defendant constitutes a contract for the sale of 
goods, governed by the provisions of the Oklahoma Uniform Commercial Code, 12A O.S. §§1-101, et seq. In its 
fifth proposition, Defendant asserts that, because the trial court erred in 
granting judgment to Plaintiffs, the trial court also erred in granting to 
Plaintiffs prevailing party attorney's fees and costs.
¶17 "In a non-jury trial the trial judge acts as the trier of fact and those 
findings are entitled to the same weight and consideration that would be given 
to a jury's verdict." Hagen v. Independent School Dist. No. I-004, 2007 OK 19, ¶7, 157 P.3d 738, 740. (Citations 
omitted.) "In an action at law the findings of fact by the trial court have the 
same force and effect as the verdict of a jury, and those findings will not be 
disturbed upon appeal where there is any evidence reasonably tending to support 
the findings." Id. "Thus, on appeal, we must accept the findings of fact 
made by the trier of fact if those findings are supported by competent 
evidence." Id.
¶18 In its first proposition, Defendant asserts its temporary underpayment 
for weaner piglets did not constitute a breach or cancellation of the contract, 
and that Plaintiffs did not, within a reasonable time after the purported breach 
in June 2009, either declare the contract "cancelled" as that term is defined by 
the UCC, 12A O.S. §2-106(4),[1] or invoke their 
remedies under 12A O.S. §2-703.[2] So, says 
Defendant, because Plaintiffs failed to demand recovery of the underpayment 
under the contract within a commercially reasonable time as required by 12A O.S. §2-709(1),[3] Plaintiffs were not entitled 
to recover damages.
¶19 We disagree. First, the parties' contract permits "termination" of the 
contract in the event of a "material breach" or "default," and there is no 
indication the parties intended to restrict "termination" of the contract only 
for reasons "otherwise than for its breach" as the term, "termination," is 
defined by the UCC. See, 12A 
O.S. §2-106(3).[4] Rather, the plain language of the contract clearly 
permits "termination" of the contract in the event of a "material breach" or 
"default" under the contract's terms.
¶20 Second, §2-703(e) permits the aggrieved seller "to recover damages for 
nonacceptance or in a proper case the [contract] price," while §2-709(1) permits 
the seller to recover both the price of goods accepted and the price of "goods 
identified to the contract if the . . . the circumstances reasonably indicate 
that such effort [to resell goods identified to the contract] will be 
unavailing." The phrase, "within a commercially reasonable time," as used in 
§2-709(1)(b) clearly describes when the risk of loss passes to the buyer, and 
does not limit the ability of the seller to recover the contract price, 
particularly where, as here, the evidence arguably demonstrates that, due to the 
lack of other buyers and the depressed market hog prices, resale of the weaner 
piglets would have been unavailing.
¶21 In the alternative, Defendant asserts in its second proposition that, if 
the original contract was terminated or cancelled in June 2009, the parties 
entered a new or modified contract at that time. Here, Defendant argues that 
Plaintiffs are "merchants" as defined by the UCC, §2-104(1),[5] and, pursuant to §2-201(1),[6] §2-201(2),[7] §2-201(3)(c)[8] and §2-204,[9] the parties 
entered a modified contract or contract by novation upon cancellation or 
termination of the original contract.
¶22 The parties' contract required all amendments or modifications to be in 
writing, and conditioned the effectiveness of any modifications or amendments on 
the existence of a writing memorializing the modification or amendment signed by 
both parties. There is absolutely no evidence of any writing, signed by both 
parties, evincing the parties' agreement to any modification or amendment of the 
original contract.
¶23 According to Plaintiffs, Defendant unilaterally, and without their 
express agreement, announced it would pay less than the contractual minimum for 
weaner piglets until the market recovered. Also according to Plaintiffs, and due 
to (1) the press of their own operating expenses and debt service, (2) the 
depressed market price of hogs, and (3) the lack of other buyers, they could not 
have then declared a termination of the contract for a material breach of its 
terms and were forced to accept payment of less than the contract price for 
their weaner pigs as a matter of economic duress. See, Centric Corp. v. 
Morrison-Knudsen Co., 1986 OK 
83, ¶14, 731 P.2d 411, 
416-417.[10]
¶24 Under these circumstances, the evidence demonstrates, at best, the 
parties' implied agreement for the Defendant's temporary payment, and 
Plaintiffs' temporary acceptance, of sums less than the contract price for 
weaner piglets delivered until the market recovered. The evidence does not 
demonstrate any express or implied agreement by Plaintiffs to accept less than 
the price for weaner piglets specified by the contract for the entire contract 
term. Plaintiffs presented evidence of Defendant's underpayment of the price 
specified by the contract for weaner piglets delivered. The record contains 
competent evidence to support the trial court's judgment.
¶25 In its third proposition, Defendant asserts that, pursuant to 12A O.S. 
§6-215,[11] 
the doctrine of commercial impracticability excused its full performance under 
the original contract. Here, Defendant asserts the unforeseen depression of hog 
market prices excused its payment of less than the contract price for weaner 
piglets.
¶26 We disagree. As pointed out by Plaintiffs, first, §2-615 specifically 
excuses performance by a "seller," not a "purchaser." Second, the parties 
negotiated a "floor" price, providing for the minimum purchase price of weaner 
pigs, and arguably demonstrates the parties appreciated that market hog prices 
might fall, so that the fall of market hog prices below the floor price was not 
an unforeseen event for which §2-615 might excuse performance. Third, Defendant 
reduced the purchase price paid for weaner piglets before the price of market 
hogs fell below the floor price of the contract. Fourth, and beyond the 
allegation of restraints and demands imposed by Defendant's bank, Defendant 
presented no evidence of its inability to pay the minimum contract price.
¶27 In its fourth proposition, Defendant asserts Plaintiffs are liable to pay 
for the semen and supplies obtained from Defendant's vendor under §2-722.[12] Here, 
Defendant argues that §2-722 imposed on Plaintiffs the obligation to pay both 
for semen and supplies obtained from Defendant's vendor, and royalties payable 
to Defendant's vendor upon sale of the market hogs.
¶28 In the present case, however, Defendant could only "estimate" the sums he 
believed Plaintiffs should be liable to pay. In the absence of admissible 
evidence demonstrating the sums Defendant claimed Plaintiffs owed with any 
certainty or particularity, we reject this proposition.
¶29 In its fifth proposition, Defendant asserts the trial court erred in 
granting attorney's fees and costs to Plaintiffs. Here, Defendant argues that, 
because the trial court erred in granting judgment to Plaintiffs, the Plaintiffs 
were not entitled to attorney's fees as prevailing parties under 12 O.S. §936.
¶30 We find no error as alleged. First, the trial court's judgment for 
Plaintiffs on the claim of breach of contract is free of legal error and 
supported by competent evidence. Second, Defendant has failed to preserve the 
alleged error in awarding attorney's fees to Plaintiffs by the timely filing of 
an amended petition in error to challenge the post-trial order granting 
attorney's fees and costs to Plaintiffs. See, Okla.Sup.Ct.R. 1.26(d), 12 
O.S. Supp. 2008, Ch. 15, App. 1.[13] We therefore cannot say the trial court erred in 
awarding attorney's fees and costs to Plaintiffs as prevailing parties under 
§936.
¶31 The orders of the trial court are AFFIRMED.

MITCHELL, P.J., and HETHERINGTON, C.J., concur.

FOOTNOTES

[1] 
"'Cancellation' occurs when either party puts an end to the contract for breach 
by the other and its effect is the same as that of 'termination' except that the 
canceling party also retains any remedy for breach of the whole contract or any 
unperformed balance. . . ."

[2] "Where 
the buyer wrongfully rejects or revokes acceptance of goods or fails to make a 
payment due on or before delivery or repudiates with respect to a part or the 
whole, then with respect to any goods directly affected and, if the breach is of 
the whole contract (Section 2-612), then also with respect to the whole 
undelivered balance, the aggrieved seller may (a) withhold delivery of such 
goods; (b) stop delivery by any bailee as hereafter provided (Section 2-705); 
(c) proceed under the next section respecting goods still unidentified to the 
contract; (d) resell and recover damages as hereafter provided (Section 2-706); 
(e) recover damages for nonacceptance (Section 2-708) or in a proper case the 
price (Section 2-709); (f) cancel."

[3] "When 
the buyer fails to pay the price as it becomes due the seller may recover, 
together with any incidental damages under the next section, the price (a) of 
goods accepted or of conforming goods lost or damaged within a commercially 
reasonable time after risk of their loss has passed to the buyer; and (b) of 
goods identified to the contract if the seller is unable after reasonable effort 
to resell them at a reasonable price or the circumstances reasonably indicate 
that such effort will be unavailing."

[4] 
"'Termination' occurs when either party pursuant to a power created by agreement 
or law puts an end to the contract otherwise than for its breach. On 
'termination' all obligations which are still executory on both sides are 
discharged but any right based on prior breach or performance 
survives."

[5] 
"'Merchant' means a person who deals in goods of the kind or otherwise by his 
occupation holds himself out as having knowledge or skill peculiar to the 
practices or goods involved in the transaction or to whom such knowledge or 
skill may be attributed by his employment of an agent or broker or other 
intermediary who by his occupation holds himself out as having such knowledge or 
skill."

[6] "Except 
as otherwise provided in this section a contract for the sale of goods for the 
price of Five Hundred Dollars ($500.00) or more is not enforceable by way of 
action or defense unless there is some writing sufficient to indicate that a 
contract for sale has been made between the parties and signed by the party 
against whom enforcement is sought or by his authorized agent or broker. A 
writing is not insufficient because it omits or incorrectly states a term agreed 
upon but the contract is not enforceable under this paragraph beyond the 
quantity of goods shown in such writing."

[7] 
"Between merchants if within a reasonable time a writing in confirmation of the 
contract and sufficient against the sender is received and the party receiving 
it has reason to know its contents, it satisfies the requirements of subsection 
(1) against such party unless written notice of objection to its contents is 
given within ten (10) days after it is received."

[8] "A 
contract which does not satisfy the requirements of subsection (1) but which is 
valid in other respects is enforceable . . . with respect to goods for which 
payment has been made and accepted or which have been received and accepted 
(Section 2-606)."

[9] "(1) A 
contract for sale of goods may be made in any manner sufficient to show 
agreement, including conduct by both parties which recognizes the existence of 
such a contract. (2) An agreement sufficient to constitute a contract for sale 
may be found even though the moment of its making is undetermined. (3) Even 
though one or more terms are left open a contract for sale does not fail for 
indefiniteness if the parties have intended to make a contract and there is a 
reasonably certain basis for giving an appropriate remedy."

[10] 
"The elements comprising economic duress are: A. The settlement was the result 
of a wrongful or unlawful act which (1) was initiated by the coercing party, (2) 
was committed with knowledge on the part of the coercing party of the impact it 
would have, (3) was made for the purpose of, and reasonably adequate to secure 
coercion over the other, and (4) resulted in obtaining undue advantage over the 
other[;] B. The act or acts complained of in (A) must have deprived the coerced 
party of its free will, leaving no adequate legal remedy nor reasonable 
alternative available. In this respect it is not enough that the alleged victim 
merely show, for example: (1) its reluctance to settle, (2) its financial 
embarrassment, or (3) its business necessities[;] [and] C. Detriment to the 
complaining party caused thereby."

[11] 
"Except so far as a seller may have assumed a greater obligation and subject to 
the preceding section on substituted performance: (a) Delay in delivery or 
nondelivery in whole or in part by a seller who complies with paragraphs (b) and 
(c) is not a breach of his duty under a contract for sale if performance as 
agreed has been made impracticable by the occurrence of a contingency the 
nonoccurrence of which was a basic assumption on which the contract was made or 
by compliance in good faith with any applicable foreign or domestic governmental 
regulation or order whether or not it later proves to be invalid. (b) Where the 
[causes] mentioned in paragraph (a) affect only a part of the seller's capacity 
to perform, he must allocate production and deliveries among his customers but 
may at his option include regular customers not then under contract as well as 
his own requirements for further manufacture. He may so allocate in any manner 
which is fair and reasonable. (c) The seller must notify the buyer seasonably 
that there will be delay or nondelivery and, when allocation is required under 
paragraph (b), of the estimated quota thus made available for the 
buyer."

[12] 
"Where a third party so deals with goods which have been identified to a 
contract for sale as to cause actionable injury to a party to that contract (a) 
a right of action against the third party is in either party to the contract for 
sale who has title to or a security interest or a special property or an 
insurable interest in the goods; and if the goods have been destroyed or 
converted a right of action is also in the party who either bore the risk of 
loss under the contract for sale or has since the injury assumed that risk as 
against the other; (b) if at the time of the injury the party plaintiff did not 
bear the risk of loss as against the other party to the contract for sale and 
there is no arrangement between them for disposition of the recovery, his suit 
or settlement is, subject to his own interest, as a fiduciary for the other 
party to the contract; (c) either party may with the consent of the other sue 
for the benefit of whom it may concern."

[13] 
"Post-trial Order for Attorney's Fees, Interest, or Costs. An amended petition 
in error to challenge a post-trial order granting or denying costs, interest, or 
attorney's fees must be filed with this Court within thirty (30) days of the 
date of the post-trial order challenged. The amended petition in error may be 
filed without payment of costs, subject to leave of court which will be granted 
or withdrawn subsequent to filing. An appellate court may order such an appeal 
to be redocketed and given a different number upon payment of an accompanying 
cost deposit. . . ."





 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 1986 OK 83, 731 P.2d 411, 57 OBJ 3083, Centric Corp. v. Morrison-Knudsen Co.
Discussed
 2007 OK 19, 157 P.3d 738, HAGEN v. INDEP. SCHOOL DIST. NO. I-004
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 936, Action on Open Account - Attorney's Fee as Costs
Cited
Title 12A. Uniform Commercial Code
 Cite
Name
Level

 12A O.S. 1-101, Short Titles
Cited
 12A O.S. 2-106, Definitions: "Contract" - "Agreement" - "Contract for Sale" - "Sale" - "Present Sale" - "Conforming" to Contract - "Termination" - "Cancellation"
Discussed
 12A O.S. 2-703, Seller's Remedies in General
Cited
 12A O.S. 2-709, Action for the Price
Cited